UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

M.D., a Minor, et al.,

      Plaintiffs,

v.              Case No. 8:09-cv-438-EAK-MAP

UNITED STATES OF AMERICA,

      Defendant.
_____/

**ORDER DENYING PLAINTIFF'S MOTION TO STRIKE FIFTEENTH AFFIRMATIVE DEFENSE**

This cause is before the Court on Plaintiffs' Motion to Strike Defendant's Fifteenth Affirmative Defense (Dkt. 64, 65) and Defendant's response thereto (Dkt. 77).

**BACKGROUND**

On August 4, 2007, Arlene Delgado died, shortly after giving birth, under the care of Central Florida Health Care Inc., an agency of the Defendant, United States of America. Plaintiffs, the beneficiaries of the decedent's estate, seek economic and non-economic damages from Defendant for medical malpractice. Defendant has asserted Florida Statute § 766.118, which could serve to cap potential non-economic damages in this case to a maximum of 1.5 million dollars, as an affirmative defense. Plaintiffs move to strike this affirmative defense on several grounds, arguing that Florida's medical malpractice liability caps unconstitutionally infringe on their rights of access to the courts, equal protection, and due process.

**STANDARD OF REVIEW**

Under Rule 12(f) of the Federal Rules of Civil Procedure, the court may order stricken from a pleading any "redundant, immaterial, impertinent, or scandalous matter" upon motion by any party. A motion to strike will "usually be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." *Pashoian v. GTE Directories n/k/a Verizon Directories*, 208 F. Supp.2d 1293, 1297 (M.D. Fla. 2002) (*quoting* Story v. Sunshine Foliage World, Inc., 120 F.Supp.2d 1027, 1030 (M.D.Fla.2000) (*citing* Seibel v. Society Lease, Inc., 969 F.Supp. 713, 715 (M.D.Fla.1997))).

**DISCUSSION**

### I. Introduction

Florida's medical malpractice liability caps were adopted by the Legislature to address the rising cost of medical liability insurance in this state. These liability caps, found in Florida Statute § 766.118, have been the repeated target of constitutional attacks by plaintiff's lawyers. The arguments contained in the Plaintiff's Motion to Strike mirror those brought in the recent case of *Estate of McCall v. United States*, 663 F. Supp. 2d 1276 (N.D. Fla. 2009). In *McCall*, United States District Court Judge M. Casey Rodgers of the Northern District of Florida thoroughly addressed these arguments and reconciled Fla. Stat. § 766.118 with both the Florida and United States Constitutions. *Estate of McCall*, 663 F.Supp. 2d at 1297. The Defendant's analysis of *McCall* and other relevant precedent is astute, and is incorporated herein by reference.

### II. House Select Committee on Medical Liability Insurance

In 2003, the Florida Legislature devoted an enormous amount of time and effort to address the statewide medical malpractice insurance crisis. Even before the regular session

began, the House Select Committee on Medical Liability Insurance (the "Select Committee") reviewed the findings of the Governor's Select Task Force on Healthcare Professional Liability Insurance, held public hearings in four cities, heard testimony from experts in all affected professional areas, and compiled an extensive hearing record. *See* Select Committee, *Final Report*, at 4, 5 (*available at* http://tinyurl.com/6eknhq). On March 5, 2003, the Select Committee published an 82-page report, exclusive of appendices, outlining its findings and concluding that "the health care community is under intense pressure to provide quality care [despite] rapidly accelerating cost factors, including significant increases in the premiums charged for medical liability insurance." *See id.* at 5. In order to address the problem of rising medical malpractice liability insurance premiums, the Legislature enacted the liability caps for non-economic damages found in Florida Statute § 766.118.

## III. Non-economic damages

Under Florida law, "non-economic damages" include non-financial losses such as pain and suffering, inconvenience, mental anguish, and loss of capacity for enjoyment of life. §766.202(8), Fla. Stat. (2007). The challenged legislation includes no limit on economic damages, such as medical expenses, long-term care, and loss of earnings. *Id.*

The limit on non-economic damages depends on the circumstances. For practitioners providing non-emergency services, the limit is $500,000.00 per claimant, per practitioner, and per occurrence. *Id.* § 766.118(2)(a). If the negligence involved death or a permanent vegetative state, the limit increases to $1 million. *Id.* § 766.118(2)(b). And if the trial court determines that a manifest injustice would otherwise occur and that there was a catastrophic injury, it may increase the limit for the injured patient to $1 million even in the absence of death or a permanent vegetative state. *Id.* For non-practitioner defendants providing non-emergency

services, the limit is $750,000.00 unless there is death, a permanent vegetative state, or unless there is catastrophic injury and there would otherwise be manifest injustice, in which case the limit for the injured patient is $1.5 million. *Id.* § 766.118(3).[1]

IV. **Access to the courts**

Unlike its federal counterpart, the Florida Constitution grants a specific right to access the courts. Article I, Section 21 states that "[t]he courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay." The Florida Supreme Court has interpreted that provision to mean that where a right of access to the courts existed before the adoption of the Declaration of Rights of the Florida Constitution, the Legislature may not abolish that right "without providing a reasonable alternative to protect the rights of the people of the State to redress for injuries, unless the Legislature can show an overpowering public necessity for the abolishment of such right, and no alternative method of meeting such public necessity can be shown." *Kluger v. White*, 281 So. 2d 1, 4 (Fla. 1973). Thus, before abolishing a right of action, the Legislature must provide a reasonable alternative or demonstrate a public necessity.

The plaintiffs cite the case of *Smith v. Department of Insurance*, 507 So.2d 1080 (Fla. 1987), for the premise that a plaintiff has not received a constitutional redress of injuries if the legislature statutorily, and arbitrarily, caps the recovery. However, the *Kruger* analysis in *Smith*

---

[1] Although the limits on non-economic damages constitute a critical component of the legislative plan, the challenged caps do not stand alone. Instead, they join with new regulations of healthcare facilities, additional licensure requirements, increased insurance regulation, and expanded requirements for state agencies. *See generally,* Ch. 2003-416, Laws of Fla. For example, the legislation provides new emergency procedures for disciplinary action against physicians who have committed at least three incidents of medical malpractice within a sixty-month period, §§ 458.3311; 459.0151; 461.0131, Fla. Stat. (2007), requires healthcare facilities to implement patient safety plans, *id.* § 395.1012, modifies pre-suit notification requirements, *id.* § 766.106, and requires mediation for malpractice cases, *id.* § 766.108(1). The statutory limits on non-economic damages, like these other provisions, provide for the improved delivery of healthcare services to all Floridians. Whether considered alone or in their broader context, the statutory limits are constitutionally permissible and within the proper bounds of legislative authority.

differs greatly from the analysis employed by the court in *McCall* and the analysis necessary in this case. As the court in *McCall* stated in distinguishing *Smith*, the court in *Smith* "relied solely on the first prong of *Kruger*, concluding that there was no reasonable alternative or commensurate benefit to justify limiting to $450,000.00 the previously unrestricted right to non-economic damages in *every* tort case." *McCall*, 663 F. Supp. 2d 1301 (emphasis added). Notably, the *Smith* court did not address the second prong of *Kruger* because the parties had never asserted that the all-torts cap was based on any overpowering public necessity. *See Smith*, 507 So.2d at 1089. Therefore, *Smith* significantly differs and is easily distinguishable from the case at hand.

The instant case closely parallels *University of Miami v. Echarte*, 618 So. 2d 189 (Fla.1993). In *Echarte*, the Florida Supreme Court held that restrictions on the right of access are constitutional where the Legislature, after a thorough fact-finding process, determines that an overpowering public necessity exists and that no reasonable alternative is available. Specifically, the Court sustained the constitutionality of a statute that limited non-economic damages in medical malpractice actions to $250,000.00 if the plaintiff granted the defendant's request to arbitrate and to $350,000.00 if the plaintiff rejected it.

In *Echarte* the court recognized that "[t]he Legislature has the final word on declarations of public policy, and the courts are bound to give great weight to legislative determinations of fact." *Id*. at 196. Relying on the substantial legislative record, the court held "that the Legislature has shown that an 'overpowering public necessity' exists." *Id*. at 197. The court observed similar deference in concluding that the Legislature had no reasonable alternative, noting that the task force concluded that "[a]ll [of its recommendations] are necessary" and that the Legislature in fact implemented those recommendations. *Id*.

When weighing the challenged legislation, the Florida Legislature made findings of fact based upon the recommendations of the Governor's Select Task Force on Healthcare Professional Liability Insurance, which demonstrate that a medical malpractice crisis did, in fact, exist, and expresses the Legislature's conclusion that the reforms, of which the challenged caps are a part, were the only means available to alleviate this crisis. *See* Governor's Select Task Force on Healthcare Professional Liability Insurance, *Final Report and Recommendations*, at 18 (Jan. 29, 2003) (hereinafter "Task Force"); Florida Senate Journal, *Journal of the Special Session D*, Number 1, (2003).

In a 345 - page report accompanied by a 13 - volume record, the Task Force found the existence of a medical malpractice crisis and recommended a limit on non-economic damage awards. The Task Force considered caps on non-economic damages a *sine qua non* of successful reform, and the Legislature adopted the findings of the Task Force. *See* Task Force, *Final Report and Recommendations* at 193. Accordingly, this Court elects to defer to the well supported conclusions of the Task Force and the Legislature that Florida's medical malpractice insurance crisis presented an overpowering public necessity requiring the adoption of the liability caps found in Florida Statute § 766.118.

V. **Trial by jury**

The plaintiffs contend that Florida Statute § 766.118 unconstitutionally violates their right to a trial by jury. The plaintiffs in *McCall* made a similar accusation, which was quickly disposed of by the court in a footnote, stating that "because this is an FTCA case, the plaintiffs had no right to trial by jury in the first place, and the court therefore has no occasion to consider the issue." *McCall*, 663 F. Supp. 2d at1299 n. 37. Although there is no claim that the statute violates the Seventh Amendment right to trial by jury, the court nonetheless notes that such

claims have been uniformly rejected by federal courts. *Id*; *Estate of Scotty Ray Sisk v. Manzanares*, 270 F. Supp. 2d 1265, 1278 (D. Kan. 2003). As the United States Supreme Court has noted, "statutes limiting liability are relatively commonplace and have consistently been enforced by the courts." *Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*, 438 U.S. 59, 88-89 n.32 (1978).

VI. **Equal protection**

The plaintiffs in both *McCall* and in the instant action challenge Florida Statute § 766.118 on equal protection grounds under both the Florida Constitution and United States Constitution. The court in *McCall* does not expressly address the "physical disability" clause of the Florida Constitution, however, it simply states that the Florida Statute § 766.118 does not involve a suspect classification or a fundamental right, and accordingly, equal protection is only violated if the statutory classification is arbitrary or capricious. *McCall*, 663 F. Supp. 2d at 1302-05. After determining that Florida Statute § 766.118 does not involve a suspect classification or fundamental right, the court in *McCall* proceeded to apply the rational basis standard to determine if the legislation was arbitrary or capricious.

In deciding whether a rational basis exists, courts will consider "(1) whether the statute serves a legitimate government purpose, and (2) whether it was reasonable for the legislature to believe that the challenged classification would promote that purpose." *Id.* (citations omitted); *see F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993). The court's inquiry is at an end where the legislature has plausible reasons for the action. *Beach Communications*, 508 U.S. at 313-314. This rational basis gives great latitude to the legislature in making classifications in areas of social and economic legislation.

Based on the legislative record discussed *supra*, the court in *McCall* concluded that "the Florida legislature had a rational and legitimate government purpose for the per-occurrence classification, i.e., the goal of making healthcare and professional liability insurance affordable and available by reducing the costs of malpractice insurance and the unpredictability of excessive non-economic damages awards." *McCall*, 663 F. Supp. 2d at 1304. The court ended its equal protection analysis by stating that the plaintiffs have failed to overcome the presumption of constitutionality, which "survive[s] unless the challenging party proves beyond a reasonable doubt that the statute is unconstitutional - that there is no conceivable factual predicate to support the classification the statute contains." *Mizrahi v. N. Miami Med. Ctr., Ltd.*, 712 So.2d 826, 829 (Fla. 3d DCA 1998).

The Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the Florida Constitution guarantee the equal protection of the laws. Florida courts have traditionally interpreted the state provision consistently with judicial interpretations of the Fourteenth Amendment. *See, e.g.*, *Sasso v. Ram Property Management*, 431 So. 2d 204, 211 (Fla. 1st DCA 1983); *Schreiner v. McKenzie Tank Lines & Risk Management Services, Inc.*, 408 So. 2d 711 (Fla. 1st DCA 1982). The First DCA has expressly and repeatedly refuted plaintiff's contention that the Americans with Disabilities Act warrants the application of strict scrutiny to laws affecting the physically disabled. *See Herrera v. Atlantic Interior Const.*, 772 So. 2d 587, 588 (Fla. 1st DCA 2000). *Patton v. TIC United Corp.*, 77 F.3d 1235, 1246-47 (10th Cir. 1996) (cap on non-economic damages recoverable by personal injury plaintiffs "does not involve a classification based on disability" because it affects all victorious personal injury plaintiffs).

The fact that the challenged caps apply to medical malpractice claimants, but not to other tort victims does not violate equal protection. The specific evil the Legislature intended to

address was the catastrophic effect of rising medical malpractice insurance premiums on the availability of quality healthcare in Florida. In 2003, the Legislature found Florida "in the midst of a medical malpractice insurance crisis of unprecedented magnitude." Ch. 2003-416, § 1, at 7, Laws of Fla.

The Third, Fourth, Fifth, Sixth, and Ninth Circuits have each rejected equal protection challenges to caps on damages in medical malpractice cases. In *Smith v. Botsford General Hospital*, the Court explained that:

> The purpose of the damages limitation was to control increases in health care costs by reducing the liability of medical care providers, thereby reducing malpractice insurance premiums, a large component of health care costs. Controlling health care costs is a legitimate governmental purpose. By limiting at least one component of health care costs, the non-economic damages limitation is rationally related to its intended purpose.

419 F.3d 513, 520 (6th Cir. 2005). The Ninth Circuit adopted similar reasoning:

> The record clearly supports a finding that the California Legislature had a 'plausible reason' to believe that the limitations on non-economic recovery would limit the rise in malpractice insurance costs. . . . [T]he Legislature had found that the rising cost of medical malpractice insurance was threatening to curtail the availability of medical care and creating the real possibility that many doctors would practice without insurance, leaving patients who might be injured by such doctors with the prospect of uncollectible judgments. . . . It was reasonable for the lawmakers to believe that placing a ceiling on non-economic damages would help reduce malpractice insurance premiums.

*Hoffman v. United States*, 767 F.2d 1431, 1437 (9th Cir. 1985).

Similarly, in *Boyd v. Bubela*, 877 F.2d 1191, 1197 (4th Cir. 1989) the Fourth Circuit sustained the constitutionality of a Virginia statute limiting all damages — economic and non-economic—recoverable in medical malpractice actions to $750,000.00. The Court held that the cap did not violate equal protection because it "bears a reasonable relation to a valid legislative purpose—the maintenance of adequate health care services in the Commonwealth of Virginia." A*ccord, Lucas v. United States*, 807 F.2d 414, 422 (5th Cir. 1986) (plaintiff "has

failed to convince us that there is no reasonable basis for the Texas legislature to conclude that this ceiling on recovery from certain institutions is not conceivably related to the availability and cost of malpractice insurance and that such insurance and the distribution of medical care in Texas are not conceivably linked."); *Davis v. Omitowoju*, 883 F.2d 1155, 1159 (3d Cir. 1989) ("Clearly the Virgin Island's decision to curb, through legislation, the high costs of malpractice insurance and thereby promote quality medical care to [its] residents . . . provides a rational basis for capping the amount of damages that can be awarded a plaintiff.").

Here, the Legislature perceived a specific evil and fashioned a specific remedy. To combat increases in medical malpractice insurance premiums, the Legislature limited non-economic damages recoverable in medical malpractice cases. A limitation on non-economic damages in medical malpractice cases accordingly complies with equal protection because it is reasonably related to the permissive legislative objective of ensuring the availability of quality healthcare by controlling the cost of medical malpractice insurance.

The aggregate limit on non-economic damages—applying to each incident regardless of the number of claimants—serves precisely the same legitimate interest served by individual caps: by reducing damage awards, limits on damages make medical malpractice insurance more affordable and quality healthcare services more available. A cap applicable to each occurrence, in cooperation with caps individually applicable to each claimant, reduces damage awards as a matter of mathematical certainty, enhances needed predictability, places a calculable limit on the exposure of healthcare and insurance providers, reduces malpractice insurance premiums, and promotes the availability of quality healthcare. The Legislature could reasonably have concluded that the means it selected—reducing damage awards through a cap on aggregate liability—would

advance the state's legitimate interest in decreasing the cost of medical malpractice insurance and enhancing the availability of quality healthcare services in Florida.

Courts have consistently upheld statutory limits on liability imposed on a per occurrence basis. In fact, in *McCall*, the Court turned away an equal protection attack upon the same per-occurrence caps challenged in this case. The Court concluded that aggregate cap served a rational and legitimate objective of "making healthcare and professional liability insurance affordable and available by reducing the costs of malpractice insurance and the unpredictability of excessive non-economic damages awards." *McCall*, 663 F. Supp. 2d at 1304. An aggregate cap "will necessarily result in less cost to insurers with greater ability to predict claims than exists with a perclaimant cap." *Id*. at 1305. It was not irrational, therefore, for the Legislature to conclude that an aggregate cap would "go farther to advance that goal" than would a per-claimant cap alone. *Id*. The Court refused to second-guess the legislative judgment, noting that the "judiciary does not 'sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.'"

VII. **Separation of powers**

The plaintiffs in the instant case also assert that Florida Statute § 766.118 amounts to a legislative remittitur, invading the functions of the judicial branch in violation of the separation of powers. The plaintiffs in *McCall* made an identical argument, which was also rejected by the trial court. In *McCall*, the Court rejected the contention that the caps challenged here amount to a forbidden "legislative remittitur" and an invasion of the rights of the judiciary. The statute does not "impermissibly interfere with the function of the judiciary," but rather "defines the substantive and remedial rights of the litigants." *McCall*, 663 F.Supp. at 1306. The Florida

Supreme Court has upheld the remittitur statute itself against the charge that it violated the province of the judiciary. *Adams v. Wright*, 403 So. 2d 391 (Fla. 1981). The challenged law performs a completely different function: it establishes, for reasons of public policy, generally applicable limits to non-economic damages. Because the challenged law does not purport to vest the Legislature with authority to make a fact intensive, case-by-case determination of the propriety of damage awards in individual cases, it does not usurp the authority of the judiciary.

VIII. **Due process**

"The test for determining whether a statute . . . violates substantive due process is whether it bears a reasonable relationship to a permissive legislative objective and is not discriminatory, arbitrary, or oppressive." *Ilkanic v. City of Fort Lauderdale*, 705 So. 2d 1371, 1372 (Fla. 1998). Under this test, the challenging party bears the "very heavy burden" of demonstrating that the statute is "arbitrary and unreasonable," and the law must be upheld if any state of facts "can reasonably be conceived to exist" in its favor. *State v. Sobieck*, 701 So. 2d 96, 103-04 (Fla. 5th DCA 1997).

In fact, the Florida Supreme Court has already decided this question. In *University of Miami v. Echarte*, 618 So. 2d 189 (Fla. 1993), the Court considered the constitutionality of a statute that limited non-economic damages in medical malpractice actions to $250,000.00 if the plaintiff granted the defendant's request to arbitrate and to $350,000.00 if the plaintiff rejected it. The Court rejected the contention that the statute infringes the due process rights of medical malpractice claimants, holding that the statute "do[es] not violate . . . substantive or procedural due process rights." *Id*. at 191. Federal courts have consistently—and with little discussion—rejected substantive due process challenges to medical malpractice caps. *See, e.g., Boyd v. Bulala*, 877 F.2d 1191, 1196-97 (4th Cir. 1989); *Davis v. Omitowoju*, 883 F.2d 1155,

1158-59 (3d Cir. 1989); *Lucas v. United States*, 807 F.2d 414, 419 (5th Cir. 1986); *Franklin v. Mazda Motor Corp.*, 704 F. Supp. 1325, 1337-38 (D. Md. 1989).

In *Lucas*, the Court accepted the Texas Legislature's recognition that "the amounts paid out in judgment have a material adverse effect on the delivery of medical and health care in Texas." 807 F.2d at 419. The Court upheld the challenged caps because the Legislature enacted them "to make affordable medical and health care more accessible and available to the citizens of Texas." *See id*. In addition, federal and Florida courts have, with equal consistency, rejected substantive due process challenges to damage award caps in other contexts. See, e.g., *Estate of Scotty Ray Sisk v. Manzanares*, 270 F. Supp. 2d 1265, 1278 (D. Kan. 2003) (caps on wrongful death damages); *Abdala v. World Omni Leasing, Inc.*, 583 So. 2d 330, 333-34 (Fla. 1991) (caps on liability of certain motor vehicle lessors); *Enterprise Leasing Co. South Central, Inc. v. Hughes*, 833 So. 2d 832, 838-39 (Fla. 1st DCA 2002) (same); *Sontay v. Avis Rent-A-Car Systems, Inc.*, 872 So. 2d 316, 319 (Fla. 4th DCA 2004) (same).

Because a limit on the recovery of non-economic damage awards is rationally related to the legitimate objective of controlling the cost of medical malpractice premiums, and, in turn, enhancing the availability and affordability of healthcare, Florida Statute § 766.118 is constitutionally permissible.

## IX. Claimant's right to fair compensation

The plaintiffs further argue that Florida Statute § 766.118 violates Article I, Section 26(a) of the Florida Constitution, entitled "Claimant's right to fair compensation." This section provides that "[i]n any medical liability claim involving a contingent fee, the claimant is entitled to receive no less than 70% of the first $250,000 in all damages received by the claimant . . .

regardless of the number of defendants," and "[t]he claimant is entitled to 90% of all damages in excess of $250,000, . . . regardless of the number of defendants."

The plaintiffs assert that because this provision requires them to receive the specified percentages of "all damages" awarded to them, any cap on the available damages is therefore unconstitutional. The contention that Article I, Section 26 of the Florida Constitution entitles a claimant to recover damages without regard to statutory limits contradicts its literal text and manifest purpose—and it was squarely rejected in *McCall*. 663 F. Supp. 2d at 1297-98. The plaintiffs in *McCall* made similar arguments to that court, which were in turn rejected as opposite of the common sense reading of the plain and ordinary meaning of the language of the provision. The Court held that, by its plain terms, "the provision acts as a restriction on the amount of attorney's fees that may be collected in a medical malpractice case, not as a definition of what amount of damages are in fact recoverable. *Id.*

This reading is further justified when considered in light of the strong presumption that a statute is constitutional, *c.f. Cavanaugh v. Cardiology Assoc. Of Orlando, P.A.,* No. 06-CA-3814, Div. 40 (Fla. 9th Jud. Cir. Ct. Oct. 30, 2007). Which the court in *McCall* specifically rejected and stated: because the caps were in existence prior to the passage of this constitutional provision, and a common sense reading of the right as a whole indicates it is aimed at protecting litigants against large contingency fees, not defining damages that may be awarded. The plain language of the statutory limitation on non-economic damages is not inconsistent with the protection afforded by Article I, Section 26(a). *McCall*, 663 F. Supp. 2d at 1298; *see also In re Advisory Opinion to the Attorney General re Medical Liability Claimant's Compensation Amendment*, 880 So. 2d 675 (Fla. 2004), where the court examined whether the amendment's ballot summary was "clear and unambiguous" as required by Florida law. It explained that the

purpose of the amendment was to "limit the contingency fee agreement between injured claimants and their attorneys in medical malpractice cases". Nowhere did the court suggest that the purpose or effect of the proposal was to invalidate statutory limits on damages.

In fact, Justice Lewis—who dissented on the ground that the summary should have declared that the purpose of the amendment was "to restrict a citizen's right to retain counsel"—noted, without contradiction by the Court, that the statutory caps would remain in effect. *See id*. at 684 (Lewis, J., dissenting) ("It is also vital to note the damage caps which now exist within the medical negligence statutory provisions, which are rarely mentioned but will continue to remain in effect should the proposed amendment be adopted. . . .").

X.  **Taking without compensation**

Finally, the Plaintiffs argue that the non-economic damages limitation is a government taking of property without just compensation in violation of due process. This argument again was rejected by the court in *McCall*. 663 F. Supp. 2d 1307. The district court noted that "[t]he damages caps were in existence prior to the time the medical negligence occurred in this case so there was no taking or vested right in the traditional sense." *Id*. Moreover, a "vested right must be 'more than a mere expectation based on an anticipation of the continuance of an existing law.'" *Id*. citing *Clausell v. Hobart Corp.*, 515 So.2d 1275, 1276 (Fla. 1987), cert. denied, 485 U.S. 1000 (1988).

It is well-settled that "[n]o person has a vested interest in any rule of law to insist that it shall remain unchanged for his benefit." *New York Cent. R.R. v. White*, 243 U.S. 188, 198 (1917). "Florida law is well established that the right to sue on an inchoate cause of action- one that has not yet accrued- is not a vested right because no one has a vested right in the common law, which the Legislature may not substantively change prospectively." *McCall*, 663 F. Supp.

2d at 1307 *citing Raphael v. Shecte,* 18 So.3d 1152, 1157 (4th DCA 2009). In this case, the prospective legislative change occurred 2003, well before any right to sue arose out of the alleged medical negligence in 2007.

Accordingly it is **ORDERED** that the Motion to Strike (Dkt. 64) be **DENIED.**

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 30th day of September, 2010.



ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies to: All parties and counsel of record.